1  JOEL McCABE SMITH [State Bar No. 050973]
   DAVID ARONOFF [State Bar No. 125694]
2  LINCOLN D. BANDLOW [State Bar No. 170449]
   LEOPOLD, PETRICH & SMITH
3  A Professional Corporation
   2049 Century Park East, Suite 3110
4  Los Angeles, California  90067-3274
   Tel. 310/277-3333; Fax 310/277-7444
5  Attorneys for Defendant
   ABERCROMBIE & FITCH

6

7

8              UNITED STATES DISTRICT COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                 WESTERN DIVISION

11

12  GEORGE DOWNING, an individual;     )   CASE NO. CV 99-4612 R(MCx)
    PAUL STRAUCH, an individual; RICK )
13  STEERE, an individual; RICHARD     )   DEFENDANT'S STATEMENT OF
    (BUFFALO) KEAULANA, an             )   UNCONTROVERTED FACTS AND
14  individual; and BEN AIPA, an       )   CONCLUSIONS OF LAW IN
    individual; MIKE DOYLE, an         )   SUPPORT OF MOTION FOR
15  individual; and JOEY CABELL, an    )   SUMMARY JUDGMENT OR, IN THE
    individual,                        )   ALTERNATIVE, MOTION FOR
16                                     )   SUMMARY ADJUDICATION OF
                 Plaintiffs,           )   ISSUES
17                                     )
         vs.                           )
18                                     )   Date: February 7, 2000
    ABERCROMBIE & FITCH, an Ohio       )   Time: 10:00 a.m.
19  corporation; and DOES 1 through    )   Ctrm: The Honorable
    50, inclusive,                     )         Manuel L. Real
20                                     )
                 Defendants.           )   TRIAL DATE:  March 28, 2000
21  _____ )

22
                    THIS CONSTITUTES NOTICE OF ENTRY
23                  AS REQUIRED BY FRCP, RULE 77(d).

24         Defendant ABERCROMBIE & FITCH submits the following

25  Statement of Uncontroverted Facts and Conclusions of Law pursuant

26  to Rule 56 of the Federal Rules of Civil Procedure and Local Rule

27  7.14.1 as follows:

28

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

623592

## UNCONTROVERTED FACTS

Defendants have established for purposes of their Motion for Summary Judgment or, in the Alternative, Motion for Summary Adjudication of Issues, each of the following facts:

1.   The Quarterly is published by A&F on a quarterly basis. In addition to containing photo layouts and other information regarding A&F fashions, the Quarterly contains substantial editorial content, including news articles, features, interviews, illustrations and photographs of general interest.  Because A&F's readers tend to be high school and college students, the Quarterly's orientation is toward news, lifestyle and humor pieces that reflect a youthful attitude.  Abasidis Decl., ¶¶ 1-4.

2.   The Spring Break 1999 edition of the Quarterly ("the Spring Edition"), which contains the Photo, was designed to incorporate a surfing theme, and contained numerous stories, photos, illustrations, and other editorial material dealing with surf culture and related topics.  The surfing lifestyle has a significant influence on fashion and popular culture and is of great interest to A&F's readers.  Abasidis Decl. ¶ 5 & Ex.  "A."

3.   Among other items, the Spring Edition incorporated:  (a) Front and back cover photos featuring surfboards and the beach; (b) An article entitled "Surf Nekkid," which recounts the history of surfing from its Polynesian roots in Hawaii; (c)  An article entitled "Beachcombing" concerning the Surfrider Foundation, an ecological group founded by surfers; (d)  An illustrated feature written by the editor of SURFER MAGAZINE entitled "Where the Wild

1  Things Are," which lampooned various surfer "types"; and (e)  An

2  interview and photo spread of surfing legend Nat Young and his son.

3  Abasidis Decl. ¶ 5 & Ex. "A."

4      4.    In keeping with the surfing theme of the Spring Edition,

5  A&F also commissioned a story entitled "Your Beach Should Be This

6  Cool" ("the Article"), which told the surf history of "Old Man's

7  Beach," located in San Onofre, California.  At about the same time,

8  LeRoy Grannis, the well-known surf photographer, provided A&F with

9  several of his photographs to illustrate the Article.  The first of

10 these photos was a color depiction of San Onofre beach, with

11 surfers riding waves in the background.  The second was the Photo,

12 a black and white depiction of surfers posed on the beach with

13 their boards at a surfing competition.[1/]  Abasidis Decl. ¶ 6.

14     5.    Because the photos provided by Mr. Grannis evoked the

15 colorful history of surfing in the early 1960's, A&F found them to

16 be appropriate illustrations for the Article, which also focused on

17 the early days of surfing.  In addition, the photographs also

18 meshed well with other features in the Spring Edition, such as the

19 "Surf Nekkid" article and the Nat Young interview, which likewise

20 dealt with the history of surfing.  Accordingly, A&F drafted a

21 simple hand-written agreement, which Mr. Grannis signed, licensing

22 A&F to utilize his photographs.  On the print of the Photo itself,

23 Mr. Grannis handwrote the names of the surfers who had posed for

24 his camera.  Abasidis Decl. ¶ 7 & Ex. "B."

25

26 _____

27 1/   The Editor of the Quarterly believed that both of these photos
   were taken during a surf competition at San Onofre beach.  Abasidis
28 Decl. ¶ 6.  Plaintiffs contend that the Photo depicts a 1960's surf
   competition in Makaha, Hawaii.  Amd. Cmpt., ¶ 16.

6.   To further illustrate the Article, an A&F photographer snapped a shot of the San Onofre Beach Club sign at the entrance to San Onofre Beach.   Utilizing this shot of the Beach Club sign and the photos supplied by Mr. Grannis, A&F then designed the layout for the Article.   In this layout, the color photo of San Onofre by Mr. Grannis was positioned on the left page, the Article (with the Beach Club sign inserted in the middle) was on the facing page, and the Photo was positioned as a two page spread on the following pages.   Abasidis Decl. ¶ 8 & Ex. "A."

7.   In preparing the layout for the Article, including the Photo, it was not A&F's intention to imply in any way that the surfers depicted in the Photo endorsed A&F's fashions.   To the contrary, particularly since the Photo was over 35 years old and seemed to be primarily of historical interest, the decision to utilize the Photo was based on the facts that it: (a) served as an appropriate illustration for the Article; (b) embodied the surf culture theme of the Spring Edition; and (c) was itself a vivid memento of the history of surfing.   Abasidis Decl. ¶ 9.[2]

8.   Apart from publishing the Photo in the Spring Edition, A&F has made no other utilization of the Photo.   A&F has not

[2]   <u>After</u> the Editor of the Quarterly designed the layout of the Article, other employees of A&F observed the numbered competition t-shirts worn by the surfers in the Photo and were inspired to design an A&F t-shirt known as the "Final Heat Tee," which is offered for sale in the Spring Edition on the pages following the Photo.   Plaintiffs do not, however, claim any proprietary right in the design of these standard issue competition t-shirts. Plaintiffs do claim that the Photo also inspired the design of A&F swimsuits featured in the Spring Edition.   However, this is untrue. Although a few of the surfers in the Photo are wearing generic flowered swim shorts, no A&F fashions were inspired by these shorts.   A&F had designed its flowered swim shorts before A&F had learned of the Photo.   Abasidis Decl. ¶ 11.

1  utilized the Photo in any print or TV ads, the Photo has not been

2  incorporated into any in-store displays or promotional materials,

3  and the Photo has not been adopted as a design or logo on any of

4  A&F's merchandise, tags or labels. A&F completed its distribution

5  of the Spring Edition many months ago and is planning no additional

6  usages of the Photo. Abasidis Decl. ¶ 10.

8  ## CONCLUSIONS OF LAW

10  ### A. The Summary Judgment Standard.

11  1.   In _Celotex Corp. v. Catrett_, 477 U.S. 317 (1986), the

12  Supreme Court strongly affirmed the value of summary judgment to

13  eliminate unmeritorious claims: "Summary judgment procedure is

14  properly regarded not as a disfavored procedural shortcut, but

15  rather as an integral part of the Federal Rules as a whole, which

16  are designed 'to secure the just, speedy and inexpensive

17  determination of every action.'" _Id_. at 327 (citations omitted).

18  2.   Under Rule 56, summary judgment "shall be rendered

19  forthwith if . . . there is no genuine issue as to any material

20  fact and that the moving party is entitled to a judgment as matter

21  of law." (Emphasis added.) "[A] party seeking summary judgment

22  always bears the initial responsibility of informing the district

23  court of the basis for its motion, and identifying [the evidence]

24  which it believes demonstrate[s] the absence of a genuine issue of

25  material fact." _Celotex_, _supra_, 477 U.S. at 323. Once the moving

26  party meets this initial burden, "Rule 56(c) mandates the entry of

27  summary judgment . . . against the party who fails to make a

28  showing sufficient to establish the existence of an element

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

623592

1   essential to that party's case, and on which that party will bear

2   the burden of proof at trial." <u>Id</u>. at 322 (emphasis added).

3      3.   Where, as in the present case, Plaintiffs are unable to

4   muster sufficient evidence to show that genuine issues exist on

5   essential elements of their claims, summary judgement is regularly

6   granted for defendants in right of publicity-related cases. <u>See</u>,

7   <u>e.g.</u>,   <u>New Kids on the Block v. News America Publishing, Inc.</u>, 745

8   F. Supp. 1540 (C.D. Cal. 1990) ("<u>New Kids I</u>"), <u>aff'd</u>, 971 F.2d 302

9   (9th Cir. 1992) ("<u>New Kids II</u>"); <u>Polydoros v. Twentieth Century Fox</u>

10  <u>Film Corp.</u>, 67 Cal. App. 4th 318, 323-25 (1997); <u>Montana v. San</u>

11  <u>Jose Mercury News, Inc.</u>, 34 Cal. App. 4th 790, 796 (1995); <u>Dora v.</u>

12  <u>Frontline Video, Inc.</u>, 15 Cal. App. 4th 536, 545 (1993).

13     B.   **The First Amendment And Related Principles Favoring**
          **Freedom Of Expression Bar Plaintiffs' First Through**
14        **Fourth Claims**.

15     4.   Unlike most right of publicity cases, which involve the

16  use of a name or likeness solely in an advertisement, the rights

17  alleged by Plaintiffs in their First through Fourth Claims are

18  outweighed by the public interest in free expression guaranteed by

19  the First Amendment.   Accordingly, Plaintiffs cannot raise a

20  genuine issue for trial on their First through Fourth Claims and

21  summary judgment on these claims should be entered for A&F.

22     5.   Under the First Amendment, "<u>the right of publicity [does]</u>

23  <u>not . . . outweigh the value of free expression</u>.  Any other

24  conclusion would allow reports and commentaries . . . to be subject

25  to censorship under the guise of preventing the dissipation of the

26  publicity value of a person's identity." <u>Montana</u>, 34 Cal. App. 4th

27  at 796 (citations and internal quotations omitted) (emphasis

28  added).   This principle arises from the basic First Amendment

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

623592

- 6 -

requirement that "freedom of expression [is] the rule," <u>Joseph</u>
<u>Burstyn, Inc. v. Wilson</u>, 343 U.S. 495, 503 (1952), subject only to
"narrowly limited" exceptions.  <u>Chaplinsky v. New Hampshire</u>, 315
U.S. 568, 571 (1942).

6.   Because of the paramount importance of the First
Amendment, California Civil Code § 3344, the basis for Plaintiffs'
First Claim, expressly provides that "[f]or purposes of this
section, a use of a name, . . . photograph, or likeness <u>in</u>
<u>connection with any news, public affairs, or sports broadcast or</u>
<u>account</u>" is <u>exempt</u> from liability.  Cal. Civ. Code § 3344(d)
(emphasis added); <u>see also</u> <u>Dora</u>, 15 Cal. App. 4th at 545 (affirming
entry of summary judgment for defendants on First Amendment grounds
in action asserting common law and Section 3344 right of publicity
claims).  For this same reason, the common law claims alleged in
Plaintiffs' Second and Third Claims cannot arise from
"[p]ublication of <u>matters in the public interest</u>, which rest[] on
the right of the public to know and the freedom of the press to
tell it . . . ."  <u>Id</u>. at 542 (emphasis added).  Plaintiffs' Fourth
Claim under the Lanham Act is subject to these same First
Amendment-related limitations.  <u>New Kids I</u>, 745 F. Supp. at 1543-
45.

7.   <u>Dora</u> is a case with striking parallels to the present
action.  The plaintiff in <u>Dora</u>, California surfer Mickey Dora
("Dora"), brought an action alleging right of publicity claims
under Civil Code § 3344 and the common law against the producers of
"The Legends of Malibu," a documentary film depicting the early
days of surfing.  The documentary included photographs, film
footage and an audio interview of Dora.  Notwithstanding the lack

1   of Dora's consent to the use of his image, name and voice in the

2   film, the trial court granted summary judgment for defendants,

3   dismissing Dora's Section 3344 and common law claims, and the Court

4   of Appeals affirmed the judgment, on the First Amendment grounds

5   that surf-culture is newsworthy and a matter of public interest.

6   Dora, 15 Cal. App. 4th at 543 & 546.

7       8.   Just like the film documentary in Dora, A&F's use of the

8   Photo for the editorial purpose of illustrating the Article is

9   equally protected by the First Amendment.  See, e.g., Leidholdt v.

10  L.F.P., Inc., 860 F.2d 890, 895 (9th Cir. 1988), cert. denied, 489

11  U.S. 1080 (1989) (affirming dismissal on First Amendment grounds of

12  right of publicity claim based on publication of newsworthy photo);

13  Ault v. Hustler Magazine, Inc., 860 F.2d 877, 883 (9th Cir. 1988),

14  cert. denied, 489 U.S. 1080 (1989) (same); Ann-Margaret v. High

15  Society Magazine, Inc., 498 F. Supp. 401 (S.D.N.Y. 1980) (granting

16  summary judgment for defendants on right of publicity claim based

17  on the publication of newsworthy photo); see also Page v. Something

18  Weird Video, 960 F. Supp. 1438, 1443-45 (C.D. Cal. 1996) (granting

19  summary judgment for defendants on right of publicity claim based

20  on publication of promotional artwork depicting plaintiff).

21      9.   Even if Plaintiffs argue that the Photo served a

22  commercial purpose as well as illustrating the Article, their

23  argument fails to raise a triable issue:  When pure speech and

24  commercial speech are "inextricably intertwined," the higher level

25  of First Amendment protection must be applied.  Riley v. Nat'l Fed.

26  of the Blind, 487 U.S. 781, 796 (1988); Gaudiya Vaishnava Soc. v.

27  San Francisco, 952 F.2d 1059, 1064 (9th Cir. 1990) (following Riley

28  in holding when "pure speech and commercial speech . . . [are]

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

623592

- 8 -

1   inextricably intertwined, the entirety must be classified as

2   noncommercial and we must apply the test for fully protected

3   speech").

4       10.  To raise a genuine issue, Plaintiffs would have to

5   introduce substantial evidence that A&F's use of the Photo was

6   "<u>exclusively</u> for [defendant's] commercial gain."  <u>Leidholdt</u>, 860

7   F.2d at 895 (emphasis added).  In other words, Plaintiffs would be

8   required to establish that the Photo served <u>no</u> "informative or

9   cultural" function <u>at all</u>, but instead "<u>merely</u> exploit[ed] the

10  individual[s] portrayed."  <u>See Midler v. Ford Motor Co.</u>, 849 F.2d

11  460, 462 (9th Cir. 1988) (emphasis added).  This is because speech

12  that does something more than "merely" advertising a product or

13  service is fully protected by the First Amendment.  <u>Central Hudson</u>

14  <u>Gas & Electric Corp. v. Public Serv. Comm'n</u>, 447 U.S. 557, 561

15  (1980) (defining commercial speech as "expression related <u>solely</u> to

16  the economic interest of the speaker and its audience") (emphasis

17  added); <u>Nordyke v. Santa Clara Co.</u>, 110 F.3d 707, 710 (9th Cir.

18  1997); <u>White v. Samsung Electronics America, Inc.</u>, 971 F.2d 1395,

19  1401 n.3 (9th Cir. 1992) (noting that, except for claims based on

20  commercial ads, "the First Amendment hurdle will bar most right of

21  publicity claims").<u>3/</u>

22

23

24  <u>3/</u>   Because of the distinction between purely commercial speech,
    and speech that contains <u>some</u> protected "informative or cultural"
25  element, virtually every right of publicity decision that has
    survived summary judgment in this Circuit has involved commercial
26  speech that did nothing more than propose a commercial transaction.
    <u>See e.g.</u>, <u>Newcombe v. Adolf Coors Co.</u>, 157 F.3d 686 (9th Cir. 1998)
27  (print advertisement); <u>Abdul-Jabbar v. General Motors Corp.</u>, 85
    F.3d 407, 415 (9th Cir. 1996) (television commercial); <u>White</u>, 971
28  F.2d at 1401 n.3 (same); <u>Midler</u>, 849 F.2d at 463 (same).

1    11.   As a matter of law, A&F's use of the Photo in this case

2    provides First Amendment protected information.   See Dora, 849 F.2d

3    at 543-46; Page, 960 F. Supp. at 1443-45; accord Polydoros, 67 Cal.

4    App. 4th at 323-25.   While A&F's use of the Photo may not be the

5    stuff of Pulitzer prizes, the Courts do not sit in judgment of the

6    merits of a defendant's message.   Hustler Magazine v. Falwell, 485

7    U.S. 46, 55-56 (1988).   Instead, there is a broad buffer zone

8    around all speech that serves an informative or cultural function.

9    Id.; Dora, 849 F.2d at 543-46; Midler, 849 F.2d at 462.   Speech

10   that entertains is entitled to as much First Amendment protection

11   as any other exposition of ideas.   Schad v. Borough of Mt. Ephraim,

12   452 U.S. 61, 65 (1981); Polydoros, 67 Cal. App. 4th at 324; see

13   also Cardtoons v. Major League Baseball Players, 95 F.3d 959, 969

14   (10th Cir. 1996).[4/]

15       12.   Under Dora, A&F's use of the Photo constituted speech

16   that, as a matter of law, was newsworthy, of public interest, and

17   fully protected under the First Amendment.   Because of these First

18   Amendment considerations, Plaintiffs cannot raise genuine issues

19   for trial on their statutory and common right of publicity claims.

20

21

_____

22   4/   The fact that A&F is in business to earn money does not
     transform its use of the Photo into unprotected commercial speech.
23   See, Joseph Burstyn, 343 U.S. at 501-02 ("That books, newspapers
     and magazines are published and sold for a profit does not prevent
24   them from being a form of expression whose liberty is safeguarded
     by the First Amendment"); Leidholdt, 860 F.2d at 895 ("[T]he
25   photograph accompanied an article whose purpose . . . was not
     simply commercial.   The fact that Hustler Magazine is operated for
26   profit does not extend a commercial purpose to every article within
     it"); Polydoros, 67 Cal. App. 4th at 325 (holding that First
27   Amendment rights "[were] not diminished when [defendants]
     advertised [and] then sold their work as mass public
28   entertainment").

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

623592

- 10 -

C.   **Plaintiffs' First, Second and Third Claims For Relief Are Barred By Principles Of Federal Copyright Act Preemption.**

13.   Right of publicity claims, including claims under Civil Code Section 3344, are regularly held to be preempted when (1) the subject of the claim is a work fixed in a tangible medium of expression that comes within the scope of copyright protection, and (2) the right asserted under state law is equivalent to the exclusive rights granted under the Copyright Act.   See, e.g., Fleet v. CBS, Inc., 50 Cal. App. 4th 1911, 1919 (1996) (affirming summary judgment where right of publicity claims were preempted); Baltimore Orioles, Inc. v. Major League Baseball Players Assoc., 805 F.2d 663, 674-79 (7th Cir. 1986), cert. denied, 480 U.S. 941 (1987) (same); Motown Record Corp. v. George A. Hormel & Co., 657 F. Supp. 1236, 1240-41 (C.D. Cal. 1987) (granting summary judgment as to right of publicity claim on preemption grounds); Ahn v. Midway Mfg. Corp., 965 F. Supp. 1134, 1137-38 (N.D. Ill. 1997) (same).

14.   In the present case, Plaintiffs' state law right of publicity claims are based upon A&F's use of the Photo.   By definition, the Photo is a "work fixed in a tangible medium of expression" that is "within the subject matter or scope of copyright protection."   17 U.S.C. §§ 102(a)(5) & 301(a); see Playboy Enterprises, Inc. v. Starware Pub. Corp., 900 F. Supp. 433, 437 n.4 (S.D. Fla. 1995).   Although Plaintiffs may assert that "a person's name, voice, likeness, and overall persona" are not copyrightable (see Fleet, 50 Cal. App. 4th at 1919), once Plaintiffs' images became fixed in this tangible medium of expression (i.e., the Photo), they came within the scope and subject matter of copyright law protection.   Id. at 1919-20;

1  Baltimore Orioles, 805 F.2d at 668 and 674-76; Motown Record, 657

2  F. Supp. at 1240-41; Ahn, 965 F. Supp. at 1138.  Accordingly, the

3  first prerequisite to copyright preemption is satisfied.  See

4  Fleet, 50 Cal. App. 4th at 1919-20.

5      15.  The second element of preemption, which examines whether

6  the rights granted under state law are "equivalent" to any of the

7  exclusive rights within the general scope of copyright, is also

8  satisfied here.  Plaintiffs seek compensation for A&F's

9  "unauthorized" display of the Photo.[5]  These claims are

10 "equivalent" to the exclusive right of reproduction afforded under

11 17 U.S.C. § 106.  Because the essence of this claim is the

12 unauthorized reproduction of a copyright-protected work, it is

13 plain that the claim is "equivalent" to copyright and is preempted.

14 See, e.g., Fleet, 50 Cal. App. 4th at 1923; Motown Record, 657 F.

15 Supp. at 1240; Ahn, 965 F. Supp. at 1137-38; Baltimore Orioles, 805

16 F.2d at 667 n.27.

17     16.  In short, Plaintiffs' right of publicity claims under

18 Section 3344 and the common law are premised on defendant's claimed

19 unlawful reproduction of a copyrightable work.  These claims are

20 preempted by the Copyright Act.

21     D.  **Plaintiffs' First Claim Under Section 3344 Is Improper
        Under Choice Of Law Principles As To Plaintiffs George**

22      **Downing, Rick Steere, Richard (Buffalo) Keaulana, Ben
        Aipa And Joey Cabell.**

23

24     17.  Plaintiffs George Downing, Rick Steere, Richard (Buffalo)

   Keaulana, Ben Aipa and Joey Cabell reside in Honolulu, Hawaii

25 (collectively, "the Foreign Plaintiffs").  Amd. Cmpt. ¶¶ 1-7.

26

27 _____

28 5/  Of course, A&F's use of the Photo actually was licensed — not
   by Plaintiffs, but by the copyright proprietor of the Photo.

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

623592

Notwithstanding this, they filed their action in Los Angeles and seek application of California law, most particularly in their invocation of California Civil Code § 3344.  Under basic choice of law principles, their reliance on California law is misplaced.

18.  Although this action is pending in federal court, California choice of law rules are governing.  _See_, _e.g._, _Matter of Yagman_, 796 F.2d 1165, 1170 (9th Cir. 1986); _Page v. Something Weird Video_, 908 F. Supp. 714, 716 (C.D. Cal. 1995).  California uses a "governmental interest" approach to determine choice of law.  _Yagman_, 796 F.2d at 1170; _Page_, 908 F. Supp. at 716.  Thus, although the federal courts have a "preference" for using the law of their forum state (_see_, _e.g._, _Yagman_, 796 F.2d at 1171), this "preference" is not applied if the "governmental interest" test is not satisfied.  The "governmental interest" approach under California law requires a three-step analysis:

> [The Court] must first consider whether the two states' laws actually differ; if so, [the Court] must examine each state's interest in applying its law to determine there is a "true conflict"; and if each state has a legitimate interest [the Court] must compare the impairment to each jurisdiction under the other's rule of law.

_Arno v. Club Med, Inc._, 22 F.3d 1464, 1467 (9th Cir. 1994); _Page_, 908 F. Supp. at 716.

19.  In applying the "governmental interest" test to the present case, significant differences stand out between the laws of California and Hawaii:  California has enacted Civil Code § 3344,

which (a) allows successful plaintiffs to recover statutory damages, actual damages, profits and punitive damages and (b) authorizes the award of attorneys' fees to the prevailing party. Hawaii has no analogous statute, and only recognizes a common law tort of invasion of privacy based on commercial appropriation of a person's name or likeness.  <u>Fergerstrom v. Hawaiian Ocean View Estates</u>, 50 Haw. 374, 441 P.2d 141 (1968).  Unlike Section 3344, neither <u>Fergerstrom</u> nor Hawaii's other case law and statutory authorities make any provision for the successful plaintiff to recover statutory damages, profits or attorneys' fees.

20.   Under the second step of the "governmental interest" test, it is clear that California has <u>no</u> state interest in protecting the publicity rights of Hawaiian plaintiffs.  For example, under very analogous circumstances, the Ninth Circuit, applying California law, stated that "New York has 'absolutely no interest in the reputation of a California citizen.'"  <u>Yagman</u>, 796 F.2d at 1171.  This same reasoning, applied in this case, mandates the conclusion that California has "absolutely no interest" in the reputation of a Hawaiian citizen.  <u>See id</u>.

21.   Finally, even if it is assumed for purposes of argument that California <u>is</u> an "interested" state, Hawaii is the jurisdiction whose interest would be more "impaired if its law were not applied."  <u>See Page</u>, 908 F. Supp. at 716.  The state in which a plaintiff resides and works, which is necessarily also the state in which damage to the plaintiff's reputation, if any, would have occurred, is generally the state whose interest would be more impaired if its law were not applied.  <u>Yagman</u>, 796 F.2d at 1171; <u>Page</u>, 908 F. Supp. at 717; <u>see also</u> 5 B. Witkin, <u>Summary of</u>

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

623592

- 14 -

1  (stating that in invasion of privacy actions the law of the state

2  of the plaintiff's domicile is generally applied).

3      22.  Based on the above authorities, as a matter of law, the

4  Foreign Plaintiffs can raise no genuine issues on their Cal. Civ.

5  Code § 3344 claims.

6  **E.   Plaintiffs' Lanham Act Claim Is Barred By The Doctrine Of**
       **Nominative Use.**

7

8      23.  Generally, the Ninth Circuit applies a multi-factor

9  "likelihood of confusion test" to Lanham Act § 43(a) claims,

   including right of publicity claims under Section 43(a).  White,
10
   971 F.2d at 1400 (citing AMF Inc. v. Sleekcraft Boats, 599 F.2d
11
   341, 348-49 (9th Cir. 1979)).  However, in New Kids II, 971 F.2d at
12
   308, the Ninth Circuit recognized that the "nominative use of a
13
   mark — where the only word reasonably available to describe a
14
   particular thing is pressed into service — lies outside the
15
   strictures of trademark law."  Id.; see also In re Dual-Deck Video
16
   Cassette Recorder Antitrust Lit., 11 F.3d 1460, 1467 (9th Cir.
17
   1993); Mattel Inc. v. MCA Records, Inc., 28 F. Supp. 2d 1120, 1141-
18
   43 (C.D. Cal. 1998).
19
       24.  The New Kids case involved two newspapers that conducted
20
   "900" number telephone polls concerning their readers' reactions to
21
   the musical group "New Kids on the Block."  The newspapers charged
22
   their readers 50 to 95 cents per minute for responding to the poll.
23
   The band — which had its own competing "900" numbers for its fans —
24
   filed Lanham Act claims against the newspapers.  The district court
25
   granted summary judgment for defendants on First Amendment grounds.
26
   New Kids I, 745 F. Supp. at 1543-45.  On appeal, the Ninth Circuit
27
   affirmed on the grounds that the newspapers' use of the band name
28

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

623592

- 15 -

1  constituted a nominative fair use because the band's name was used

2  to describe plaintiff's product (*i.e.* the band) rather than

3  defendants' product (*i.e.* their reader polls).  New Kids II, 971

4  F.2d at 306-09.

5      25.  The Ninth Circuit in New Kids II set out a three-part

6  test for a "commercial user . . . [to be] entitled to a nominative

7  fair use defense":

8          First, the product or service in question must

9          be one not readily identifiable without use of

10         the trademark; second, only so much of the mark

11         or marks may be used as is reasonably necessary

12         to identify the product or service; and third,

13         the use must do nothing that would, in

14         conjunction with the mark, suggest sponsorship

15         or endorsement by the trademark holder.

16  Id. at 308.

17     26.  In the present case, A&F's use of the Photo was

18  "nominative" in the same manner as defendants' purported

19  "infringements" in New Kids II, Dual-Deck and Mattel.  A&F did not

20  utilize the Photo as a "trademark" by, for example, emblazoning it

21  on the cover of the Quarterly, featuring it in any print ads or in-

22  store displays, or adopting it as a logo or insignia on any of

23  A&F's merchandize or labels.  Instead, A&F used the Photo to

24  illustrate the Article and to depict surfing's history in a manner

25  that would be "readily identifiable" to A&F's readers.  A&F used

26  only so much of Plaintiffs' purported "marks" (i.e., a single

27  reproduction of the Photo) as was "reasonably necessary" to fulfill

28  A&F's editorial purpose.  Finally, A&F's reproduction of the Photo

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

623592

1    contains nothing to suggest that any of the Plaintiffs now sponsor

2    or endorse products being offered for sale by A&F more than thirty

3    years after the Photo was taken.

4         27.  In short, as a matter of law, A&F's utilization of the

5    Photo constituted a nominative use that is not violative of the

6    Lanham Act.

7    **F.   Plaintiffs' Lanham Act Claim Is Barred Because No**

8         **Evidence Exists Of Likely Confusion.**

9         28.  Apart from the issue of nominative fair use, to raise a

10   genuine issue for trial, each plaintiff must introduce substantial

11   evidence of likelihood of confusion.  White, supra, 971 F.2d at

12   1399-1400.  In right of publicity cases, in a manner similar to

13   trademark cases, this determination is made under a multi-factor

14   test based on the:  (1) strength of the plaintiffs' mark; (2)

15   relatedness of the goods; (3) similarity of the marks; (4) evidence

16   of actual confusion; (5) marketing channels used; (6) degree of

17   purchaser care; and (7) defendant's intent.[6]  Id. at 1400 (citing

18   AMF, supra, 971 F.2d at 348-49).  Because this case involves

19   substantial First Amendment issues (see Section IV, supra),

20   Plaintiffs' showing of likely confusion must be "particularly

21   compelling."  Twin Peaks Productions v. Publications Int'l, 996

22   F.2d 1366, 1379 (2d Cir. 1993); No Fear, Inc. v. Imagine Films,

23   Inc., 930 F. Supp. 1381, 1383-84 (C.D. Cal. 1995).

24        29.  In the present case, Plaintiffs fail to raise genuine

25   issues for trial under these likelihood of confusion factors:

26   _____

27   6/   A final factor that is generally considered in trademark
     cases, likelihood of expansion of product lines, "does not appear

28   to be apposite to . . . celebrity endorsement case[s]."  White, 971
     F.2d at 1401.

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

623592

                                  - 17 -

a.   <u>Strength of the mark</u>.  In right of publicity type cases under the Lanham Act, the "mark" refers to the plaintiff's "persona."  <u>White</u>, 971 F.2d at 1400.  "The 'strength' of the mark refers to the level of recognition the celebrity enjoys among member of society."  <u>Id</u>.  In the present case, Plaintiffs have no evidence, individually or collectively, that their names and images from a 35-year old surf photo were well-known to the public to whom the Quarterly was directed.  Accordingly, their "marks" or "celebrity identities" are weak.

b.   <u>Relatedness of goods</u>.  "In cases concerning confusion over celebrity endorsement[s], the plaintiff's 'goods' concern the reasons for or source of the plaintiff's fame."  <u>White</u>, 971 F.2d at 1400.  In the present case, accordingly, plaintiff's "goods" consist of their surfing prowess over 35-years ago, in the early 1960's.  These "goods" are not "closely related" to A&F's "goods," which consist of casual sportswear clothing.

c.   <u>Similarity of the marks</u>.  The Photo, which is reproduced in the Quarterly in grainy black and white, was taken over 35 years ago and depicts Plaintiffs as they looked in a bygone era.  The Photo does not depict Plaintiffs as they now look, 35 years later.  Accordingly, this factor does not raise a genuine issue for trial.

d.   <u>Evidence of actual confusion</u>.  Plaintiffs have produced no evidence of consumers who have been "confused" into believing that Plaintiffs supposedly "endorsed" A&F's merchandise.  See <u>White</u>, 971 F.2d at 1400.  The absence of such evidence proves that consumers have not been confused.  See <u>McGregor-Doniger</u>, 599 F.2d at 1126, 1136 (2d Cir. 1979).  Likewise, Plaintiffs' failure

1   to present survey evidence is proof that no confusion exists.  E.S.
2   Originals, Inc. v. Stride Rite Corp., 656 F. Supp. 484, 490
3   (S.D.N.Y. 1987).  Accordingly, this factor too weighs against a
4   finding of likelihood of confusion.

5           e.   Marketing channels.  Plaintiffs have produced no
6   evidence that they have utilized their images in other marketing
7   channels similar to the Quarterly.  See White, 971 F.2d at 1400.
8   Accordingly, this factor too weighs against a finding of likelihood
9   of confusion.

10          f.   Degree of consumer care.  Generally, consumers are
11  held to exercise a low level of consumer care when items are
12  inexpensive, when they are impulse purchases, or when the consumers
13  in question are children.  See McGregor-Doniger, 599 F.2d at 1137-
14  38.  In contrast, in the present case, the items offered for sale
15  in the Quarterly are not inexpensive and care must be taken by
16  consumers to correctly order the proper item, color and size.  As a
17  result, the level of consumer care here weighs against a finding of
18  likelihood of confusion.

19          g.   Defendant's intent.  In determining the issue of
20  intent, "[t]he relevant question is whether the defendants
21  'intended to profit by confusing consumers' concerning the
22  [alleged] endorsement . . . ."  White, 971 F.2d at 1400.  In the
23  present case, no evidence whatsoever exists that A&F intended to
24  profit by "confusing consumers."  To the contrary, the sole
25  evidence is that A&F "intended" for the Photo to illustrate the
26  Article and to depict the early years of surfing.

27     30.  In short, the likelihood of confusion factors that must
28  be examined under White establish that Plaintiffs, individually and

1   collectively, cannot raise triable issues on their Lanham Act

2   claims.  This conclusion is buttressed by the substantial First

3   Amendment issues in this case, which weigh in balance against a

4   finding of likely confusion.  <u>See</u> <u>No Fear</u>, 930 F. Supp. at 1383-84.

5       **G.   Plaintiffs' Claims For Monetary Recovery Under The Lanham
            Act Are Barred Because No Evidence Exists Of Actual**

6       **Confusion Or Wrongful Intent.**

7       31.  Plaintiffs' Lanham Act claims are solely claims for

8   monetary damages.  Although injunctive relief is also available

9   under the Lanham Act, such relief is not relevant here because A&F

10  has completed its distribution of the Magazine and is making no

11  additional usages of the Photo.  FACTS, <u>supra</u>, ¶ 8.  Thus, any

12  claim for injunctive relief would be moot.  <u>See</u> <u>In Re Circuit</u>

13  <u>Breaker Litigation</u>, 860 F. Supp. 1453, 1456 & n.4 (C.D. Cal. 1994),

14  <u>aff'd</u>, 106 F.3d 894 (9th Cir. 1997).

15      32.  With respect to Plaintiffs' claims for monetary relief,

16  Plaintiffs' cannot raise genuine issues for trial regarding <u>either</u>

17  their purported claims for "profits" or "damages":

18          a.   <u>No recovery of "profits</u>."  Even assuming, contrary

19  to the facts, that A&F's utilization of the Photo in the Magazine

20  resulted in "profits," it is basic that the recovery of "profits"

21  under Section 43(a) of the Lanham Act requires proof of <u>intentional</u>

22  wrongful conduct by the defendant.  <u>See</u>, <u>e.g.</u>, <u>Faberge, Inc. v.</u>

23  <u>Saxony Products, Inc.</u>, 605 F.2d 426, 429 (9th Cir. 1979); <u>Maier</u>

24  <u>Brewing Co. v. Fleischmann Distilling Corp.</u>, 390 F.2d 117, 123-24

25  (9th Cir. 1968).  In the present case, their exists no evidence

26  whatsoever that A&F was attempting to capitalize on the supposed

27  "fame" of Plaintiffs.  Indeed, the evidence is to the contrary:

28

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

623592

1   A&F intended that the Photo would illustrate the Article and depict

2   the early years of surfing.

3           b.   No recovery of "damages."  "In a suit for damages

4   under section 43(a) [of the Lanham Act], . . . actual evidence of

5   some injury resulting from the deception is an essential element of

6   the plaintiff's case."  Harper House, Inc. v. Thomas Nelson, Inc.,

7   889 F.2d 197, 209-10 (9th Cir. 1989) (emphasis added in part);

8   accord Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 525 (10th

9   Cir. 1987).  Such "[a]ctual consumer confusion may be shown by

10  direct evidence, a diversion of sales or direct testimony from the

11  public, or by circumstantial evidence such as consumer surveys."

12  Brunswick, 832 F.2d at 525.  In the present case, however,

13  Plaintiffs have no evidence of confused consumers or other economic

14  harm cause by A&F's use of the Photo.

15      33.   Because Plaintiffs cannot raise a genuine issue as to

16  monetary relief under their Fourth Claim, and injunctive relief is

17  moot, the Fourth Claim should be dismissed.

18      **H.   Plaintiffs' Fifth Claim For Negligence Is Contrary To
         Ninth Circuit Law.**

19

20      34.   The Ninth Circuit recently concluded that negligence

21  claims cannot arise from advertising that allegedly violates

22  publicity rights.  Newcombe, 157 F.3d at 695.  As noted in

23  Newcombe, it is impossible for a negligence claim to arise from the

24  supposedly "negligent" creation of an ad because "there [is] simply

25  no damage from the creation of [an] ad; the only alleged damages

26  result[] from publication."  Id.  Likewise, no claim can be

27  asserted for "negligent" publication of an ad because "negligent

28  publication is essentially the same as either a claim for

1   misappropriation or for defamation, and . . . the constitutional

2   and statutory principles regarding those standards cannot be

3   circumvented by artful pleading." <u>Id</u>.  Thus, under <u>Newcombe</u>,

4   Plaintiffs' negligence claim is improper and should be dismissed.

5   <u>Id</u>.; <u>accord</u> <u>Polydoros</u>, 67 Cal. App. 4th at 326 (holding that right

6   to free expression under the First Amendment precludes negligence

7   claim).[7]

8       I.   <u>**Plaintiffs' Sixth Claim For Defamation Is Unsupported By**</u>
             <u>**Any Evidence Of Defamatory Statements "Of And Concerning"**</u>
9            <u>**Plaintiffs**</u>.

10          35.   Under California Civil Code § 45a, a plaintiff may only

11  prevail on a claim for libel if the publication is libelous on its

12  face (libel <u>per</u> <u>se</u>) or if explanatory matter and special damages

13  are pleaded and proven (libel <u>per</u> <u>quod</u>).  5 <u>Witkin</u>, Torts, § 481 at

14  565; <u>Newcombe</u>, 157 F.3d at 694.  The determination of libel <u>per</u> <u>se</u>

15  is one of law, and is measured by the effect the publication would

16  have on the mind of an average reader.  <u>Newcombe</u>, 157 F.3d at 695.

17  The libel must also be "of and concerning" the plaintiff.  <u>Blatty</u>

18  <u>v. New York Times Co.</u>, 42 Cal. 3d 1033, 1042 (1986).

19          36.   Here, the Spring Edition contains <u>no</u> statement libelous

20  on its face that is "of and concerning" Plaintiffs.  Instead,

21  Plaintiffs' defamation claim is premised on the allegations that

22  the inclusion of "numerous models, primarily male, in a variety of

23  lewd or suggestive poses" in the Spring Edition has "subjected

24  [Plaintiffs] to ridicule, obloquy, and causes them to be shunned or

25

26  <u>7</u>/   Plaintiffs' Fifth Claim for negligence is also subject to
    dismissal on federal Copyright Act preemption grounds.  <u>See</u> <u>Motown</u>
27  <u>Record</u>, <u>supra</u>, 657 F. Supp. at 1240 (finding negligent interference
    claim arising from purported violation of publicity rights to be
28  preempted by Copyright Act); <u>see</u> <u>also</u> Section C., <u>supra</u>.

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

623592

- 22 -

1   avoided, and has a tendency to injure them in connection with their

2   occupations." Amd. Cmpt. ¶¶ 62-63.

3       37.  Notwithstanding Plaintiffs' overheated and inaccurate

4   descriptions, as a matter of law no "average person" viewing the

5   Spring Edition could find it libelous per se (see Cal. Civil Code

6   § 45) that the 35-year old Photo of Plaintiffs is contained in the

7   same publication with A&F's decidedly non-graphic models.  To the

8   contrary,

9           magazines with sexually explicit text and

10          photographs . . . are a part of our

11          contemporary scene.  Successful candidates for

12          the Presidency of the United States consent to

13          interviews in magazines of the same genre as

14          Hustler.  We think that plaintiff is not

15          entitled to damages merely because there is an

16          oblique reference to him in a magazine which he

17          believes to be in bad taste.

18  Handelman v. Hustler Magazine, Inc., 469 F. Supp. 1053 (S.D.N.Y.

19  1979); accord Falwell v. Penthouse Int'l, Ltd., 521 F. Supp. 1204,

20  1209 (W.D. Va. 1981) (holding that publication of an interview and

21  photo of plaintiff in Penthouse magazine did not give rise to an

22  "implication of cooperation" that was defamatory).

23      38.  Moreover, Plaintiffs have utterly failed to meet the

24  alternative requirements under Civil Code § 45a for libel per quod.

25  Plaintiffs have not alleged and have no proof of (a) "explanatory

26  matter, such as an inducement, innuendo or other extrinsic fact" or

27  (b) "special damage as a proximate result thereof."  See 5 Witkin,

28  Torts, § 493 at 580 ("[w]here words or other matters are of

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

623592

- 23 -

1   ambiguous meaning, or are innocent on their face but defamatory in

2   light of extrinsic circumstances . . ., the plaintiff must plead

3   and prove that they were used in a particular meaning which makes

4   them defamatory") (emphases in original); see also Gomes v. Fried,

5   136 Cal. App. 3d 924, 939-40 (1982) (holding that "special damages"

6   are damages "suffered in respect to [plaintiff's] property,

7   business, trade, profession or occupation" which must be "pled and

8   proved precisely").

9       39.   In short, Plaintiffs cannot raise a genuine issue as to

10   their defamation claim.

11       40.   The inclusion of any uncontroverted fact as a conclusion

12   of law, and/or the inclusion of any conclusion of law as an

13   uncontroverted fact shall not affect the validity of any such

14   uncontroverted fact or conclusion of law.

15

16   DATED:   January 14, 2000

17

18                       JOEL McCABE SMITH

19                       DAVID ARONOFF
                        LINCOLN D. BANDLOW

20                       LEOPOLD, PETRICH & SMITH
                        A Professional Corporation
                        Attorneys for Defendant

21                       ABERCROMBIE & FITCH

22

23

24                         Feb. 14, 2000

25

26   U.S.D.J.

27

28

1   **PROOF OF SERVICE**

2

3   STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

4        I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action; my business address is 2049 Century Park East, Los

5   Angeles, California  90067-3274.

6        On January 14, 2000, I served the foregoing document described

7   as **DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION OF ISSUES** on the

8   interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

9

10                     Brent H. Blakely, Esq.
                       HEWITT & McGUIRE, LLP
                       865 Manhattan Beach Boulevard, Suite 204

11                     Manhattan Beach, California  90266

12        I caused such envelope with postage fully prepaid to be placed in the United States mail at Los Angeles, California.  I am

13   "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the

14   U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is

15   presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in

16   affidavit.

17   ____  An additional copy of said document was sent on the same date to each of the addressees stated above at the specified

18         telefax numbers.

19         Executed on January 14, 2000, at Los Angeles, California.

20   ____  (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

21

22   _X_   (Federal) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service is made.

23

24   _____Kathryn K. Toyama_____
         Type or Print Name

25

26

27

28